## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**DONALD ALAN BOULDEN,**

      **Plaintiff,**

**v.**                              **No. 21-cv-0440 KWR/JHR**

**JERRY ROARK, DAVID JABLONSKI,**
**CECILIA HERNANDEZ, NEW MEXICO**
**DEPARTMENT OF CORRECTIONS,**
**GEO GROUP INC., GEO LEA COUNTY**
**CORRECTIONAL FACILITY, DWAYNE**
**SANTIESTEVAN,** *Warden*, **ALISHA TAFOYA**
**LUCERO,** *Secretary of Corrections*

      **Defendants.**

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION TO GRANT GEO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. 163]

THIS MATTER is before me on GEO Defendants' Motion for Summary Judgment and Memorandum of Law in Support. [Doc. 163]. *Pro se* prisoner Donald Boulden responded [Doc. 172] and the GEO Defendants replied [Doc. 178]. U.S. District Judge Kea Riggs referred this case to me for proposed findings and a recommended disposition. [Doc. 97]. I recommend GRANTING summary judgment on Boulden's federal claims at issue, Counts X and V, and REMANDING the state claims back to state court.

### I.      BACKGROUND

#### A.  **Relevant Procedural and Factual History**

This is the second report and recommendation ("PF&RD") that I have submitted in this case.  The Court issued a Memorandum Opinion and Order ("MOO") on October 6, 2023, [Doc. 135], ruling on my prior set of proposed findings and recommended disposition, [Doc. 127]

(recommending granting [Docs. 61, 66], denying [Docs. 76, 98], denying as moot all other pending motions, and dismissing the case without prejudice). The Court adopted the recommendations in part and noted that Boulden's claims stem from two distinct events:  first, alleged denial of "two lump sum awards of good time credits for the completion of educational courses," and second, "a prohibition on taking additional correspondence courses or receiving educational material." [Doc. 135, p. 2].  The Court dismissed all federal claims related to denial of lump sum awards pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994). *Id.* at 4-8. However, the Court declined to apply *Heck* to dismiss Counts V and X alleging First and Fourteenth Amendment violations, respectively, from the alleged deprivation of educational materials. *Id.* at 8-12. The Court also declined to apply *Heck* to bar Boulden's state law claims because Defendants did not provide authority for that result. *Id.* at 12.

The Court found that a *Martinez* report was necessary to aid resolution of the remaining claims. *Id.* at 13. The GEO Defendants filed their *Martinez* report and Statement of Undisputed Material Facts ("UMF") on January 26, 2024. [Doc. 162]. They concurrently filed a Motion for Summary Judgment, the subject of this PF&RD. [Doc. 163].

**B. Parties' Arguments**

1. GEO Defendants' Motion for Summary Judgment [163].

Boulden's remaining claims relate to his alleged lack of access to educational materials in violation of the First and Fourteenth Amendment. [Doc. 163, p. 7-14].  The GEO Defendants ("Defendants") generally argue that summary judgment is proper because the undisputed material facts in the *Martinez* report show that Boulden lacks evidence on essential elements of his claims. [Doc. 163]; [Doc. 164] (*Martinez* Report).

2

Defendants assert that Boulden's claims against individual Defendants Hernandez and Santisevan fail because they did not personally stop Boulden from registering for additional correspondence courses. *Id.* Defendants emphasize that Hernandez only refused to recommend Boulden's lump sum award and those claims have been dismissed. *Id.* at 5. Nor did Santistevan personally deny Boulden additional correspondence course enrollment. *Id.* Thus, Defendants contend that Boulden cannot "establish the requisite personal involvement of Santisevan [and Hernandez] to sustain his remaining claims unrelated to the lump sum award." *Id.*

Defendants also argue that Boulden's claims against Defendant GEO fail as a matter of law. They say Boulden cannot show that an individual employee violated his rights, which section 1983 requires since it does not allow *respondeat superior* liability. *Id.* at 6. Defendants urge that Count V alleging First Amendment violations and Count X alleging Fourteenth Amendment violations both fail under this analysis. *Id.* at 6-14.

In their First Amendment analysis, Defendants assess NMCD's policy directive temporarily suspending independent study correspondence courses under the four *Turner* factors governing the reasonableness and legitimacy of a prison regulation. *Id.* at 9; *see Turner*, 482 U.S. at 78. Defendants defend their "policy directive [as] appropriate under *Turner.*" *Id.* at 10. Furthermore, Defendants cite the undisputed material facts to show that no GEO employee "prevent[ed] Boulden from corresponding or communicating with anyone at any time [or] from pursuing his postsecondary education at any time." *Id.* at 11. Defendants acknowledge a two-month *de minimus* delay between Boulden finishing his paralegal course and enrolling in a criminal law course but deny that a GEO employee caused it. *Id.* Therefore, Defendants ask for

summary judgment on Count V because of "a complete lack of evidentiary support for Boulden's claim" that the policy violated the First Amendment. *Id.*

In their Fourteenth Amendment analysis, Defendants challenge the claim that their policy violated Boulden's liberty interests by preventing him from receiving education material. *Id.* at 12. Citing the undisputed material facts, Defendants outline the trajectory of Boulden's paralegal, criminal, and torts program enrollment and coursework to conclude that "there is no factual predicate for any due process claim arising from Boulden's access to correspondence or publications transmitted by mail." *Id.* at 12-13. Defendants argue in the alternative that, even assuming the two-month delay between courses constituted a liberty interest deprivation, Boulden "cannot prevail on a due process claim because he was afforded adequate opportunity to challenge the issue" through an informal grievance resolved in his favor. *Id.* at 13.

Defendants also contend that Boulden fails to show a policy or custom motivating the violation of his rights (i.e., he cannot show *Monell* liability). *Id.* at 14. Because the policy is valid under the *Turner* factors, Defendants reason that "issues surrounding a specific policy or custom are likely moot." *Id.* at 14, 15. Notwithstanding, Defendants distance themselves from *Monell* liability because the policy was formed and announced by NMCD, not GEO; "[a]bsent evidence that a policy *of GEO* was the moving force," Boulden has no constitutional claim against GEO *Id.*

Finally, Defendants request dismissal on Boulden's state law claims on five grounds. First, Boulden impermissibly tries to circumvent his sentence arguing state law claims relating to the "*very fact* of his confinement" which are "barred unless and until he has prevailed in his habeas proceeding." *Id.* Second, state constitutional claims are not "self-executing" and cannot provide Boulden immediate relief. *Id.* at 16, 17. Third, the two mechanisms to enforce state constitutional

4

claims, the New Mexico Tort Claims Act ("NMTCA") and the New Mexico Civil Rights Act ("NMCRA"), only apply to public employees or public bodies and therefore do not apply to a private entity like GEO. *Id.* at 19, 20. Fourth, they underscore the lack of a private right of action to enforce prison policies under state law. *Id.* at 20. Finally, they discount Boulden's "standalone" vicarious liability claim because "no basis for derivative liability exists" without a claim against a GEO employee. *Id.*

        2.   <u>Boulden's Response [Doc. 172]</u>

Boulden's response contains several themes: Defendants ratified GEO's policy; the policy was valid at inception but later became unconstitutional; the policy "effectively annihilated" his rights; and there is a "supervisory link" for vicarious liability. *See* [Doc. 172]. He alleges that by "carrying [the policy] out over a sustained period of time . . . [Defendants] effectively adopted and promulgated" the policy and violated his rights. [Doc. 172, p. 3]. He proposes four "materially relevant" facts about NMCD policy revisions show a two-year pattern of constitutional violations. *Id.* at 3, 4. He also urges the Court disregard the policy applied and instead apply the old 2016 policy. *Id.* at 4. Boulden asserts that Defendants "purposefully mislead to the Court" by applying an "ex post facto" policy temporarily suspending independent study correspondence courses. *Id.*

Boulden defends his assertion of *respondeat superior* liability, arguing that Defendant Santisevan's job to enact the policy through subordinates creates "[t]he 'link' for supervisory liability." *Id.* at 5. He also argues that the "supervisory link" exists through Defendant Hernandez because she refused to process his lump sum recommendations but would have done so "but for the policy directive issued by her superior, Defendant Santisevan." *Id.* at 6. Boulden believes both Hernandez and Santisevan should be individually liable for violating his rights. *Id.* at 7.

Boulden concedes that the policy directive "started out possessing a penological justification" but argues that rationale "ceased to exist" "given the extended length of time that policy was carried out (at least 954 days)" from 09/07/2018 to 11/11/2020. *Id.*  "[At] minimum," he says, the policy lacked justification for 843 days from 09/07/2018 to 09/09/2020. *Id* at 8. Boulden alleges those delays "completely barred" him from corresponding with BCI [Blackstone Career Institute] and thereby violated his right to receive mail. *Id.* Moreover, because neither NMCD nor "GEO's unilaterally chosen Mesalands Community College" offers paralegal training, Boulden argues that he has no alternative means of obtaining the course materials, in violation of his Fourteenth Amendment liberty interests. *Id.* at 8-9

## II.    LEGAL STANDARDS

Rule 56(c) provides that summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard is analogous to a directed verdict in the trial context. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). The moving party may satisfy its burden of showing no genuine issue of material fact by "affirmatively disproving the nonmoving party's case" or by "directing the court's attention to the fact that the nonmoving party lacks evidence on an element of its claim." [Doc. 69, p. 4] (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986)).

If the moving party chooses the latter strategy, it has the initial burden of explaining the basis of its motion "and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits on file, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. After the motion is filed and adequate time for discovery has passed, Rule 56 permits a court to enter

summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In that context, no genuine issue of material fact exists "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

A *Martinez* report is an investigative report that a court orders prison officials to prepare in order to aid the court to determine if a *pro se* prisoner's allegations have any basis. *Kirk v. Winn*, 347 F. Supp. 3d 918, 921 (D.N.M. 2018). It is "designed to aid the court in fleshing out possible legal bases" from unsophisticated prisoner complaints. *Id.* It is "simply to give the trial court sufficient information for the orderly consideration of issues." *Rider v. Werholtz*, 548 F. Supp. 1188, 1202 (D. Kan. 2008). An uncontroverted *Martinez* report may serve as a basis for dismissal. *Gallagher v. Shelton*, 587 F.3d 1063, 1067 n.7 (10th Cir. 2009).

### III.   <u>ISSUES</u>

1. Whether Boulden failed to establish essential elements of his First Amendment claim (Count V) alleging violation of his right to educational materials based on the temporary policy such that summary judgment is proper?

2. Whether Boulden failed to establish essential elements of his Fourteenth Amendment claim (Count X) alleging violation of his liberty interest by not receiving educational materials such that summary judgment is proper?

3. Whether Boulden failed to establish essential elements of his state constitutional claims?

### IV.   <u>DISCUSSION</u>

**A.  I recommend granting summary judgment on Boulden's First Amendment claim (Count V) because the policy is reasonable under the *Turner* factors.**

7

1.  <u>Background and Law on the *Turner* Factors</u>

I propose finding that the policy temporarily suspending certain correspondence courses did not violate Boulden's First Amendment rights. The Tenth Circuit has explained the interaction between an inmate's rights and the prison's authority:

> Resolution of the inmates' claims requires balancing between the constitutional rights retained by inmates and those who send them publications against the deference owed to prison authorities when it comes to prison administration. *Turner v. Safley,* 482 U.S. 78, 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Inmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison. *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Clement v. Cal. Dep't of Corrs.,* 364 F.3d 1148, 1151 (9th Cir.2004). In weighing the First Amendment interests against the deference afforded corrections officials, the reasonableness of the regulations and policies matters. *Thornburgh v. Abbott,* 490 U.S. 401, 414, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

*Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004) (finding error in the district court's *Turner* analysis because the court only discussed the first factor and no others). An inmate's challenge to a restriction must "include sufficient facts to indicate the plausibility that the actions of which he complains were *not* reasonably related to legitimate penological interests." *Gee v. Pacheco*, 627 F.3d 1178, 1187-88 (10th Cir. 2010).

With that background in mind, the Court previously found that Boulden stated a First Amendment claim based on Defendants allegedly prohibiting his access to educational material. [Doc. 135, p. 9]. It noted that in the specific context of "a prison regulation imping[ing] on inmates' constitutional right to receive information, the regulation is valid if it is *reasonably related* to legitimate penological interests." *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Because a *Turner* analysis was not ripe at the motion to dismiss stage, the *Martinez* report order directed Defendants to analyze the policy at issue under the four *Turner* factors:

(1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest; (2) whether alternative means of exercising the constitutional right remain available to inmates; (3) any effect accommodating the right would have on guards, inmates, and allocation of prison resources; and (4) the absence of ready alternatives.

[Doc. 149]; [Doc. 135, p. 10] (internal citation omitted).

> 2.   The _Turner_ factors show that the policy was reasonable and related to legitimate prison interests.

After examining the _Turner_ factors, I propose finding that the policy was related to a legitimate penological interest and did not unlawfully infringe on Boulden's rights. [Doc. 164, p. 23-28]. I also propose finding that Boulden has not alleged sufficient facts from which it can be plausibly inferred that the policy was not reasonably related to valid prison interests.

> i.  _Turner Factor #1_

The policy satisfies the first _Turner_ factor because NMCD has the legitimate, neutral objective of ensuring that inmates lawfully complete their sentences. I agree with Defendants that neutrality has been shown because the policy "affected all independent correspondence courses, thereby showing neutrality as to content." [Doc. 164, p. 25], To be sure, Boulden was not participating in the unaccredited religious classes which the policy targeted. However, the policy applied to all independent study correspondence courses. Therefore, the policy is neutral on its face.

 I also agree that the policy had a legitimate objective. "Legitimate policy interest" is a fairly easy standard for prison officials to meet because they enjoy substantial discretion over how to further prison security, resources, and rehabilitation goals. _See_ 1 Rights of Prisoners § 2:5 (5th ed.) (collecting cases). NMCD temporarily instituted the policy so that inmates could not reduce

their sentences by accruing good time through courses from unaccredited institutions unapproved by NMCD. Prison officials were responding to a specific problem with a temporary stop-gap solution. As contracted prison operators, the GEO Defendants carried out the policy with the legitimate goal of maintaining fairness and order in the prison so inmates would serve their lawfully imposed incarceration terms. Unapproved good time reductions of those terms undermine valid penological interests.

### ii.   *Turner Factor #2*

The policy also satisfies the second *Turner* factor because of alternative means of exercising the First Amendment right at issue.  Prisoners have a constitutional right to correspond with persons outside the prison subject to the objectives and concerns of the prison. *Turner*, 482 U.S. at 84; *Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir. 1990).  Boulden advances a right to an independent study correspondence course which NMCD temporarily curtailed. This framing, however, slices the right too fine. I agree with Defendants' framing that Boulden was "not prohibited from engaging in all forms of postsecondary education; the directive only applied to the limited subcategory of independent study correspondence courses." [Doc. 163, p. 10]. Boulden could still correspond with outside educational programs and in fact he did. His dissatisfaction with the particular educational institutions or quality of the courses offered through the facility is inapposite. Boulden retained alternative means of exercising his rights despite the policy directive.

### iii.   *Turner Factor #3*

The policy satisfies the third *Turner* factor because the impact of accommodating Boulden's preferred educational course would undermine prison operations and burden prison workers and resources. This factor is similar to the first factor considering the regulation's

reasonableness; however, the third factor "considers a more hypothetical state of affairs in which the court considers the reasonableness of the prohibition in light of alternative ways of operating the prison proposed by the plaintiff."  1 Rights of Prisoners § 2:7 (5th ed.) (collecting cases).

As an initial matter, Boulden did not appear to propose an accommodation but only demanded to continue his independent study correspondence course as he wished. Practical problems arise from singling out one inmate to provide a type of study materials unavailable to the general inmate population. Prison employees would need to direct additional personalized attention to managing Boulden's independent correspondence coursework instead of other important tasks. It could also create a negative "ripple effect" because "changes to one area of prison administration can often cause problems in other areas." *Id.*  It is reasonable for officials to anticipate that other inmates would view the accommodation as unfairly allowing Boulden to benefit from good time credits they are denied. *Id.* Because inmates (including Boulden) may still take advantage of other educational opportunities, the impact of accommodating Boulden specifically outweighs the policy's inconvenience to him. Overall, this factor does not undermine the policy's reasonable relation to legitimate prison interests.

### iv.   *Turner Factor #4*

Finally, the policy satisfies the fourth *Turner* factor because there is no "obvious, easy alternative" to accommodate Boulden's right with *de minimus* effect on valid penological interests. This factor examines whether the policy is "an exaggerated response to a prison's administration." 1 Rights of Prisoners § 2:8 (5th ed.) (collecting cases). As stated above, the policy was a real-time response to the recent and ongoing problem of essentially buying good time credits to secure an earlier release. Prison officials thus crafted a tailored, temporary response through the policy. The

burden is on the prisoner to show that there are obvious, easy alternatives to the regulation. *Id.* Short of nixing the policy or at least exempting him from it, Boulden has not proffered any easy, obvious alternative. While applying the policy only to the religious correspondence classes used to abuse good time credits could conceivably be an obvious alternative, narrowing the policy in this way could run afoul of neutrality and risk discriminatory effect. Thus, the fourth factor supports the policy.

In sum, the *Turner* factors show that the temporary policy suspending a certain subset of courses was reasonable to ensure inmates did not circumvent their sentences with a good time loophole. I therefore propose finding that the policy did not violate Boulden's First Amendment rights.

　　　3.　Boulden has also failed to show that Defendants are liable for constitutional violations under *Monell*.

I also propose finding that Boulden cannot bring constitutional claims under *Monell.* [Doc. 163, p. 14-15]; *see Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). *Monell* requires a plaintiff to show that (1) an employee of the defendant entity violated his constitutional rights, and (2) a policy or custom of the entity was the "moving force" behind the alleged constitutional violations. *Monell*, 436 U.S. at 690. Under section 1983, "supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit." *Herrera v. Santa Fe Public Schools*, 41 F. Supp. 3d 1027, 1144 (D.N.M. 2014). *Monell* thus mandates a plaintiff to identify a particular policy or custom which caused the alleged harm. *Id.* at 1177 (internal citation omitted).  Private corporations also enjoy *Monell*'s shield against vicarious liability as well as the defense of qualified immunity. *Id.* at 1177, 1178 ("*Monell* is a fact-based causation standard, and qualified immunity is a legal defense").

As explained above, I agree with Defendants that the *Turner* factor analysis renders Boulden's constitutional claims moot because the policy is lawful. Notwithstanding, I also agree that Boulden has failed to "hurdle . . . *Monell*'s factual barrier" by proving that a policy or custom of Defendant GEO violated his rights. [Doc. 163, p. 14, 15]; *see Herrera*, 41 F. Supp. 3d at 1179. Indeed, Boulden has not pointed to any policy or custom of Defendant GEO—not NMCD—which he alleges violated his rights. *See Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005) ("[I]n order to hold [Corrections Corporation of America] liable for the alleged tortious acts of its agents, Ms. Smedley must show that *CCA directly caused the constitutional violation* by instituting an 'official municipal policy of some nature' . . . that was the 'direct cause' or 'moving force' behind the constitutional violations") (emphasis added).   Defendants thus contend that Defendant GEO's connection to the policy is too attenuated to be the "direct cause" or "moving force" because they simply carried out the policy of NMCD. The *Martinez* report demonstrates that NMCD decided to suspend independent study correspondence courses temporarily to remedy the problem of inmates circumventing the rules for good time credits through taking classes from unaccredited schools. Defendant GEO merely served as the mechanism which carried out NMCD's policy.

Boulden's response argues in a conclusory fashion that "Defendants carrying [the policy] out over a sustained period of time . . . effectively 'adopte[ed] and promulgate[d]'" it, thereby violating his First and Fourteenth Amendment rights." [Doc. 172, p. 3]. He also implies that Defendant GEO is applying the wrong policy and should "abid[e] and adher[e] to the governing 2016 policies in effect at the time of this incident." *Id.*  This argument admits that Defendant GEO did not directly cause the offending policy while urging that this should not allow Defendant GEO

13

to escape *Monell* liability. Boulden provides no authority for his legal assertion. I recommend finding that Boulden has failed to show *Monell* liability against Defendant GEO based on the policy.

**B. I recommend granting summary judgment on Boulden's Fourteenth Amendment claim (Count X) because Boulden fails to meet its elements.**

        1.  <u>Fourteenth Amendment Background.</u>

I propose finding that summary judgment is proper on Boulden's Fourteenth Amendment claim because he fails to muster sufficient facts to establish essential elements of his Fourteenth Amendment. "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221, (2005). To succeed on a deprivation of educational correspondence claim, a plaintiff must prove that his educational materials were not delivered, that defendant was responsible for the non-delivery, and that defendant acted intentionally or was deliberately indifferent. *Id.* Boulden has not done so.

The Court previously found that Boulden plausibly alleged that "the complete bar from receiving educational material violated his liberty interest under the Fourteenth Amendment." [Doc. 135, p. 11]. It reasoned that "a prisoner has a liberty interest under the Fourteenth Amendment in correspondence and publications in the mail." *Id.* at 12. (citing *Treff v. Galetka*, 74, F.3d 191, 194-95 (10th Cir. 1996)) (stating that inmate correspondence outside the prison implicates the First Amendment "and a qualified liberty interest under the Fourteenth Amendment"). And the Court noted that Defendants did not move to dismiss this claim on the basis of deprivation of educational material. *Id.*

14

2.  <u>Fourteenth Amendment Analysis</u>

Claim X alleges that Defendants "have egregiously violated Plaintiff's Constitutional rights by their direct and deliberate acts" citing to the Fourteenth Amendment [Doc. 40, p. 11]. Defendants' respond that nothing in the record shows Defendants barred Boulden from educational correspondence because "[t]here is no evidence any letter sent by Boulden to BCI, or any letters sent by BCI to Boulden, were . . . impacted in any way by GEO's implementation of NMCD's policy directive." [Doc. 163, p. 12] (citing UMFs 11-17). Defendants reiterate that Boulden had to complete paralegal classes and had to save money to pay for new courses before starting criminal law classes. *Id.* (citing UMF 12, 20). They provide a timeline: Boulden completed paralegal studies on January 9, 2019, had enough money to pay tuition by March 7, 2019, enrolled in the independent study criminal law course on March 27, 2019, and completed the course on July 26, 2019. *Id.*  at 12, 13 (citing UMF 17—20). They note his subsequent approval for and enrollment in a torts class. *Id.* at 13 (citing UMF 23, 24). Based on these events, Defendants assert that the evidence fails to show a "factual predicate for any due process claim" concerning Boulden's correspondence courses. *Id.* at 13.

Boulden counters that "Defendants stopped, blocked, and denied" BCI correspondence programs which "effectuated a rejection of BCI's publications and [his] right to them via mail." *Id.* at 9. He contends that he has a right to Fourteenth Amendment procedural due process "when publications are rejected." *Id.*  Moreover, he credits his enrollment in the criminal law course to "the culmination of discussions" with the education director who is a "reasonable person [and] realized that blocking and denying [his] right to postsecondary education via correspondence" violated his constitutional rights. *Id.* Boulden also complains that Defendant Hernandez violated

his liberty interests by refusing to process lump sum recommendations, which she would have done "but for the policy directive issued from her supervisor, Defendant Santistevan." *Id.* at 6.

While it is difficult to discern exactly which facts Boulden relies upon for his Fourteenth Amendment claim, is it is clear that he does not establish the essential elements and create a genuine issue of violation of his liberty interest. The undisputed material facts decidedly do not reveal a "complete bar" to educational materials. Boulden admits that his discussions with the education director resulted in him resuming classes. Boulden's claims that Defendants "blocked and denied" his educational opportunities are conclusory and unsupported. Nor has he shown a causal connection from the policy to any of the short delays he experienced between approval and enrollment. Finally, aside from Hernandez's expression of her personal opinion, there is no evidence that Defendants intended to, or in fact did, stop his educational correspondence. Therefore, I recommend the Court grant summary judgment on Boulden's Fourteenth Amendment claim (Count X).

## C. I recommend remanding the remaining state law claims in the absence of any cognizable federal claims.

The Court previously declined to dismiss Boulden's state law claims under *Heck* without Tenth Circuit precedent to do so. [Doc. 135, p. 12]. Having recommended dismissal on Boulden's federal claims, I now recommend the Court decline to exercise supplemental jurisdiction over his remaining state claims. *See* 28 U.S.C. § 1367(c)(3). Because I propose finding that state court is the more appropriate forum for the state claims, I do not directly address Defendants' arguments for their dismissal.

1.  <u>Supplemental Jurisdiction Law</u>

"Under § 1367, a district court may decline to exercise supplemental jurisdiction over a state law claim if, among other reasons, it has dismissed all claims over which it has original jurisdiction." *Tufaro v. Oklahoma ex rel. Bd. of Regents of Univ. of Oklahoma*, 107 F.4th 1121, 1141 (10th Cir. 2024) (internal citation and quotation omitted). "A district court should normally dismiss supplemental state law claims after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial." *United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002). Nonetheless, a court must consider the "nature and extent of pretrial proceedings, judicial economy, convenience, and fairness" in making this determination." *Tufaro*, 107 F.4th at 1141 (internal citation omitted). The Tenth Circuit has suggested that in some circumstance it may be appropriate for a district court to retain supplemental jurisdiction over state claims after dismissing all federal claims "when the parties have already expended a great deal of time and energy on the state law claims." *Foxfield Villa Assocs., LLC v. Robben*, 967 F.3d 1082, 1103 (10th Cir. 2020) (internal citation omitted). However, a district court may disregard the suggestion without abusing its discretion so long as "it gives good reasons for doing so." *Id.*

In *Foxfield*, the Tenth Circuit upheld the district court's denial of supplemental jurisdiction over twenty-three state law claims after dismissal of the sole federal claim. *Id.* at 1102. The plaintiff objected to the district court declining to retain jurisdiction because "nearly four years ha[d] passed since they filed their relevant complaint, [] the parties ha[d] engaged in a great deal of discovery and filed many motions, and . . . ha[d] already filed and objected to the pretrial order." *Id.* The Tenth Circuit found no abuse of discretion in the district court's reasoning that the state court was a better forum for the "copious state law issues," in part to avoid inconsistent rulings on the state

17

issues. *Id.* at 1103. Indeed, the court announced "that the many state law claims—twenty-three, to be exact—are a good enough reason under the abuse-of-discretion standard to send this case to the Kansas state courts despite the significant resources that the parties have expended in federal court." *Id.*

### 2. Exercising supplemental jurisdiction risks inconsistent results on unsettled law.

Considering this background, I recommend the Court decline to exercise supplemental jurisdiction over Boulden's numerous state law claims considering my recommendation to grant summary judgment on his two federal claims. *Foxfield* is instructive to the instant state law claims. First, Boulden's proportion of state-to-federal claims also weighs in favor of remanding the state claims. After the Court dismissed the federal claims regarding lump sum awards, Boulden still asserted at least ten claims under state law (*e.g.*, Claims I—X) as compared with two federal claims (Counts V and X). *See* [Doc. 163, p. 16, 17]; [Doc. 135]. Like in *Foxfield*, the majority of remaining claims here are state law issues, which is adequate justification to decline jurisdiction.

Although the parties have engaged in some motions practice and a *Martinez* report, I propose finding that the nature and extent of pretrial proceedings is not so advanced as to warrant exercise of supplemental jurisdiction in federal court. Dispositive motions routinely filed early in a case, like the dismissal and summary judgment motions here, generally do not implicate the complications and expense of the discovery process. These parties have certainly not gotten as far down the discovery path as the *Foxfield* parties, who had already filed pretrial order objections. The *Martinez* report is also a mechanism to weed out nonviable claims early in a case and does not cut against declining to retain federal jurisdiction.

18

I also propose finding that "copious" state law questions implicated by the myriad of state law claims favors remand to state court. This is particularly so considering the Court expressed concerns with the lack of authority on whether *Heck* bars the state law claims. [Doc. 135, p. 122]. It thus reserved ruling on the state law claims. *Id.* at 18. Another case in this district recently followed suit. *See White v. Padilla*, No. 1:21-CV-1204-MIS-JFR, 2024 WL 531291, at *4 (D.N.M. Feb. 9, 2024), *on reconsideration in part*, No. 2:21-CV-1204-MIS-JHR, 2024 WL 3901389 (D.N.M. Aug. 22, 2024) (citing the Court's MOO declining to rule on whether *Heck* applies to state law claims because "the Tenth Circuit has yet to directly rule" on that issue)).

Given this uncertainty, exercising supplemental jurisdiction over the ten state law claims creates more than a speculative concern that federal court rulings could create inconsistent case law on these topics.  For these reasons, I recommend the Court decline to extend its supplemental jurisdiction to decide Boulden's state law claims without any remaining federal law claims.

## V.   CONCLUSION

I respectfully **RECOMMEND** that the Court **GRANT** the GEO Defendants' Motion for Summary Judgment [Doc. 163] on **Count V** alleging First Amendment violations and **Count X** alleging Fourteenth Amendment liberty interest violations.

I further **RECOMMEND,** should the Court adopt the recommendation to dismiss the federal claims, that the Court decline to exercise supplemental jurisdiction over state law claims and so remand them to state court for resolution.

_____
**JERRY H. RITTER**
**UNITED STATES MAGISTRATE JUDGE**

19

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed**