## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**DONALD ALAN BOULDEN,**

      **Plaintiff,**

**v.**                                         **No. 21-cv-0440 KWR/JHR**

**JERRY ROARK, DAVID JABLONSKI,
CECILIA HERNANDEZ, NEW MEXICO
DEPARTMENT OF CORRECTIONS,
GEO GROUP INC., GEO LEA COUNTY
CORRECTIONAL FACILITY, DWAYNE
SANTIESTEVAN,** *Warden***, ALISHA TAFOYA
LUCERO,** *Secretary of Corrections***,**

      **Defendants.**

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION TO GRANT THE STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. 164] AND DISMISS THE CASE WITH PREJUDICE.

THIS MATTER is before me on Alisha Tafoya Lucero, Jerry Roark, and David Jablonski's ("State Defendants") Martinez Report and Brief in Support of Summary Judgment [Doc. 164]. *Pro se* prisoner Donald Boulden responded [Doc. 173] and the State Defendants replied [Doc. 188]. U.S. District Judge Kea Riggs referred this case to me for proposed findings and a recommended disposition. [Doc. 97]. I recommend GRANTING summary judgment on Boulden's remaining federal claims, Counts X and V, DISMISSING or REMANDING the state claims back to state court, and DISMISSING the case with prejudice.

1

# I.    <u>BACKGROUND</u>

## A.  Boulden's Claims

I recount Boulden's claims as found in the Court's prior Memorandum Opinion and Order. [Doc. 175].  Boulden is detained at New Mexico Corrections Department and is proceeding pro se. *Id.* at 1, He asserts various state law and federal § 1983 claims stemming from (1) denial of two lump sum awards of good time credits for the completion of educational courses, and (2) a prohibition on taking additional correspondence courses or receiving educational material. *Id.*

Boulden submitted an independent course of study request to prison officials seeking permission to participate in a correspondence course in paralegal studies offered by Blackstone Career Institute. *Id.*   at 1, 2 [citing Doc. 40, Amended Complaint, at ¶ 21]. The request was approved. *Id.* at 2. He also completed a correspondence course in criminal law through Blackstone Career Institute and received a certificate of completion for that program in July 2018. *Id.*

In August 2019, Boulden submitted a request for two thirty-day lump sum awards of good time claiming his completion of the paralegal studies and criminal law courses entitled him to a sixty-day reduction of his current prison sentence. *Id.* (citing [Doc. 1, Exs. 1, 2, at ¶¶ 20-21]). Boulden alleges those requests for good time credit were denied. *Id.* Boulden also alleges that, for approximately two years, Defendants prohibited him from receiving educational material. *Id.* (citing [Doc. 40 at ¶¶ 26, 39]).

## B.  Procedural History

In his "Amended Tort Complaint" [Doc. 40], Boulden asserted claims under the following titles:

- Count 1: Violation of state created liberty interest protected under the Due

Process Clause of U.S. Const. Amend. XIV; N.M. Const. Art. II, Sec. 18

- Count II: Violation of State Created conditions of confinement, CD 121011, et seq.

- Count III: Violation of State Statute 33-2-34 NMSA 1978

- Count IV: Breach of state created CD 121101 et seq contract

- Count V: Violation of Plaintiff's United States First Amendment Rights, and New Mexico Constitutional rights U.S. Const. Am. I, NM. Const. Art. II, Sec. 7.

- Count VI: Prejudicial discrimination in violation of the Fourteenth Amendment; U.S. Const. Am. XIV, N.M. Const. Art. II, Sec. 18.

- Count VII: Cruel and Unusual Punishment without penological justification

- Count VIII: Violation of Equal Protection of the Laws, U.S. Const. Am. XIV, N.M. Const. Art. II, Sec. 18

- Count IX: Violation of Separation of Powers, N.M. Const., Art III

- Count X: Abridgement of constitutional rights, U.S. Const. Am. XIV

-  Count XI: Vicarious Liability

- Count XII: Retaliation

*Id.* at 2, 3.

Those claims were winnowed through two previous dispositive rulings. The Court issued a Memorandum Opinion and Order ("MOO") on October 6, 2023, [Doc. 135], ruling on my first set of proposed findings and recommended disposition. [Doc. 127] The Court adopted the recommendations in part, noting that Boulden's claims stem from two distinct events: first, an alleged denial of "two lump sum awards of good time credits for the completion of

educational courses," and second, "a prohibition on taking additional correspondence courses or receiving educational material." [Doc. 135, at 2].

The Court then dismissed Counts I, VI, VII, and VIII challenging the alleged deprivation of good time credits from of lump sum awards ("LSA") pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994). *Id.* at 4–8, 16. The Court also dismissed all federal constitutional claims against Defendants Tafoya Lucero and Jablonksi, to the extent *Heck* may not apply, due to lack of personal involvement by those defendants. *Id.* at 17. The Court further determined that federal constitutional claims against the New Mexico Department of Corrections fail because "§1983 claims do not sound against a state entity." *Id.* at 17. The Court also dismissed Counts XII alleging vicarious liability and Count XII alleging retaliation. *Id.*

However, the Court declined to dismiss Counts V and X alleging First and Fourteenth Amendment violations from the alleged deprivation of educational materials. *Id.* at 8–12, 17–18. The Court also declined to dismiss Boulden's state law claims because Defendants did not provide authority for that result. *Id.* at 12, 18. The Court found that a *Martinez* report was necessary to aid resolution of the remaining claims after proper evaluation of the *Turner* factors governing the reasonableness of a prison regulation. *Id.* at 13, 17.

Accordingly, the GEO Defendants filed a *Martinez* report and Statement of Undisputed Material Facts ("UMF") on January 26, 2024. [Doc. 162]. They also filed a Motion for Summary Judgment arguing Boulden failed to establish essential elements of Counts V and X, his First and Fourteenth Amendment claims. [Doc. 163]. I issued my recommendation that the Court grant summary judgment dismissing Counts V and X and remand the state law claims [Doc. 188, at 19].

The Court adopted the recommendation to dismiss the Counts V and X but reserved ruling on the state law claims until resolution of claims against the remaining defendants. [Doc. 191, at 4].

The State Defendants also filed a *Martinez* report and Motion for Summary Judgment requesting dismissal of Counts V and X and the state law claims. [Doc. 164]. The instant PF&RD recommends granting summary judgment for the State Defendants on all remaining claims.

## II.    BRIEFING SUMMARY

### A.    The State Defendants' Motion for Summary Judgment.

Boulden's remaining claims allege lack of access to educational materials in violation of the First and Fourteenth Amendment. [Doc. 164, at 2]. The State Defendants[1] generally argue that summary judgment is proper because the undisputed material facts in the *Martinez* report show that Boulden lacks evidence on essential elements of his claims. [Doc. 164, at 2–3]. They urge that the policy of temporarily suspending a subset of educational courses—independent correspondence courses—was justified under the governing *Turner* factors; thus, no First Amendment violation occurred. *Id.* at 22–28. They argue that Boulden has no liberty interest in independent correspondence course participation and, in any event, continued receiving educational materials during the temporary suspension; thus, no Fourteenth Amendment violation occurred. *Id.* at 28–31.

Defendant Roark asserts that qualified immunity shields him from personal capacity claims because Boulden provides no case law "making it clearly established that Defendant Roark has violated any of [Boulden's] civil rights" for issuing the temporary suspension on independent correspondence courses." *Id.* at 31–33. Finally, the State Defendants maintain that the state law

---

[1] The State Defendants include Defendants Alisha Tafoya Lucero, Jerry Roark, and David Jablonski. [Doc. 164].

claims should be dismissed based on: the undisputed facts, lack of waiver of immunity, and failure to state a claim. *Id.* at 33 (incorporating argument in [Doc. 66] Defendant Tafoya Lucero's Motion for Judgment on the Pleadings).

**B.    Boulden's Response.**

Boulden's incorporates many of the same arguments he used in response to GEO Defendants' Motion for Summary Judgment, *compare* [Doc. 173], *with* [Doc. 172]: the temporary suspension policy was valid at inception but later became unconstitutional; the policy had the effect of "totally annihilating" his rights; and there is a "supervisory link" to hold Defendant Roark vicariously liable and defeat qualified immunity. [Doc 173, at 3]; *see* [Doc. 172]. He again urges disregard of the temporary suspension policy actually applied and instead application of the old 2016 policy, and recycles his lump sum award arguments. [Doc. 173, at 4, 5]. Boulden now adds that the State Defendants "cloud the case by wrongly conflating" the "educational courses," presumably through prison programs, with the independent correspondence courses he was "blocked" from. *Id.* at 4. He also claims that Defendant Roark wronged him by not rescinding the temporary policy or directing his successor to do so. *Id.* at 5–6.

Boulden makes several arguments distinct to the State Defendants' Motion. He attempts to challenge many of the State Defendants' undisputed facts by reweaving his arguments into recitations of purportedly disputed facts. *Id.* at 5-14. Boulden also fights summary judgment and qualified immunity for Roark by positing:

> I have presented substantial factors [challenging the undisputed facts] that Defendant Roark' [sic] decision to issue the policy directive was the moving force and caused the constitutional violations. By the extended 263 days of enforcement I submit NMCD-State effectively adopted and promulgated it to be the continual force behind it. I proffered a viable link to Defendant Roark for supervisory liability that removes qualified immunity.

*Id.* at 15.

Boulden supplies his *Turner* factor analysis, announcing that he has a well-established constitutional right to receive mail including "publications and [] correspondence, such as Blackstone Career Institute of Law (BCI) educational program books." *Id.* at 18. He then partially concedes the first *Turner* factor that an "initial penological justification" existed for the temporary policy. *Id.* at 20, 27.

He offers conflicting analyses for the second factor, availability of alternate ways to exercise his rights. He proposes "[a] viable workable alternative" of pausing the issuance of LSAs "until it could be verified that the particular program qualifies for the LSA." *Id.* at 16, 20, 27. He decries the facility's, and specifically Roark's, solution of "freezing" all independent study correspondence as "exaggerated." *Id.* at 27. However, he later declares "[t]here was absolutely no alternative means" of still exercising his right to "legal published studies" and explains: "The LCCF-GEO's [sic] unilaterally chosen Mesalands Community College (MCC) is not a school of law either. The one [legal] course offered, Introduction to Criminal Justice was a required course for the Business degree." *Id.* Boulden also says the facility's "exclusive control over his mail" precludes any alternative means of exercising his right. *Id.* at 29. He finally emphasizes the courses he took during the suspension were not legal courses and not taken via correspondence. *Id.* ("And none of these were course toward becoming a qualified paralegal ….").

For the third factor, impact of the policy on guards and prison staff, Boulden contends "the only impact on prison staff . . . is a positive one" because educational courses foster rehabilitation and a "more mature and peaceful" inmate. *Id.* at 29–30. Boulden restates the same arguments in

favor of the fourth factor but adds that *Turner's* neutrality factor was not met because the policy was not the least restrictive means of ensuring the goal of prison safety. *Id.* at 31, 32.

Boulden addresses Roark's qualified immunity defense throughout his brief. He alleges that Roark is liable for constitutional violations because "it was his decision and direct act" to implement the policy "without an NMCD committee hearing and input." *Id.* at 21. He also faults Roark's supposed failure to rescind the policy or leave directions to do so. *Id.* at 23. He finally insists that Roark intentionally withheld his educational materials and directed subordinates to do the same (evidencing the "supervisory link" for constitutional liability). *Id.* at 33. Thus, Boulden contends qualified immunity does not save Roark. Boulden incorporates the same arguments to support his state law claims.

## C.    The State Defendants' Reply.

The State Defendants assert that Boulden's response fails to controvert their undisputed material facts supported by the evidence. [Doc. 180, at 1, 2]. They dismiss Boulden's *Turner* analysis as unpersuasive while noting his partial acquiescence to the first factor *Id.* at 2. The personal liability claims against Defendant Roark also fail, they say, as well as any against Defendants Tafoya Lucero and Jablonski. *Id.* (noting the federal claims against Tafoya Lucero and Jablonski have been dismissed). The State Defendants note that the New Mexico Corrections Department (NMCD) is not a proper party because it was never served; thus, there is "no such thing" as "official capacity liability" for NMCD despite Boulden's claims. *Id.* Regardless, the State Defendants emphasize that Boulden has failed to demonstrate any *Monell* liability for NMCD as an institution. *Id.* at 2, 3.

The State Defendants review and dismiss Boulden's objections to their undisputed material facts, urging that those Boulden did not respond to[2] remain undisputed. *Id* at 3. Facts he addressed[3] but did not substantially dispute under Rule 56 also remain undisputed. *Id.* Boulden "either asserts immaterial information, elaborates on the stated fact, or opines on its relevance thereby failing to dispute the language within the [undisputed material fact] as stated." *Id.* The State Defendants argue these two groups of facts remain undisputed and are deemed admitted. *Id.*

The State Defendants analyze a third group containing undisputed facts to which Boulden properly objects (numbers 7, 13, 15, 25, 30, 33, 37, and 41). *Id.* at 3–7. I summarize their objections to Boulden's attempt to dispute these facts:

- Speculation for no. 7, that few religious programs meant the policy was an exaggerated response;

- Immaterial and unsupported for no. 13 because the policy ended May 28, 2019, despite Defendant Roark's departure and regardless Boulden continued his coursework;

- Unsupported and immaterial for no. 15 because there is no evidence Roark had to clear the policy with the Secretary of Corrections;

- Misleading for no. 25 because evidence shows that Boulden continued his coursework contrary to his characterization.

- Unsupported for no. 30 that Boulden was deprived of educational materials during the claimed time period when the evidence shows he took the desired course;

- Unsupported for no. 33 that Boulden was denied materials from 2019 to 2021;

- Unsupported and irrelevant for no. 37 because Boulden explains his criminal justice class and concedes this class from 2022 is not related to this lawsuit; and

- Unsupported and inaccurate for no. 41 because Boulden's argument for supervisory liability via a grievance response explaining the policy revision does meet the elements for supervisory liability.

---

[2] Fact numbers 1, 2, 5, 10-12, 16, 19, 22, 24, 27, 42-45).
[3] Fact numbers 3-4, 6, 8-9, 14, 17-18, 20-21, 23, 26, 28-29, 31-32, 34-36, 38-40, and 46-47.

[Doc. 180, 4–6].

The State Defendants further discuss the merits of their reply and Boulden's common refrains. *Id.* at 7–12. They urge that any delays which Boulden claims stymied his educational journey were "no more [than] would generally result from typical bureaucratic functions" *Id.* at 7. They also counter that Boulden's frequent proposal of a "less restrictive solution" fails because controlling law affords great deference to prison officials. *Id.* (collecting cases). Finally, they dispute Boulden's claim that the temporary suspension policy was a "complete annihilation" of the educational policy because the suspension applied only to the subset of independent study correspondence classes. *Id.* at 8.

The State Defendants rebut each of Boulden's *Turner* factor counterarguments and conclude that the policy was reasonably related to a legitimate penological interest, and thus constitutionally sound. *Id.* at 8- 10. They summarize:

> The four *Turner* factors weigh in Defendants' favor that indeed the temporary regulation change prohibiting new enrollments in independent correspondence study courses was related to a legitimate penological interest—the terms of an inmates' incarceration and what good time credits or LSAs of good time an inmate may receive is directly related to the security of an institution, as well as the fair and orderly application of the LSA policy. Moreover, due to the lack of any delay in [Boulden's] access to educational course or materials, he has not established a constitutional injury.

*Id.* at 11. Regarding Roark's personal liability, the State Defendants protest that Boulden still fails to show that Roark violated any clearly established civil right or that he had "a sufficiently culpable state of mind" when issuing the policy. *Id.* (collecting cases). Thus, they urge all claims against Roark must be dismissed based on qualified immunity. *Id.* at 12.

### III.    <u>LEGAL STANDARDS</u>

Rule 56(c) states that summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard is analogous to a directed verdict in the trial context. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). The moving party may satisfy its burden of showing no genuine issue of material fact by "affirmatively disproving the nonmoving party's case" or by "directing the court's attention to the fact that the nonmoving party lacks evidence on an element of its claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

If the moving party chooses the latter strategy, it has the initial burden of explaining the basis of its motion "and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits on file, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323. After the motion is filed and adequate time for discovery has passed, Rule 56 permits a court to enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In that context, no genuine issue of material fact exists "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

A *Martinez* report is an investigative report that a court orders prison officials to prepare in order to aid the court's determination if a *pro se* prisoner's allegations have any basis. *Kirk v. Winn*, 347 F. Supp. 3d 918, 921 (D.N.M. 2018). It is "designed to aid the court in fleshing out possible legal bases" from unsophisticated prisoner complaints. *Id.* It is "simply to give the trial

court sufficient information for the orderly consideration of issues." *Rider v. Werholtz*, 548 F.

Supp. 1188, 1202 (D. Kan. 2008). An uncontroverted *Martinez* report may serve as a basis for

dismissal. *Gallagher v. Shelton*, 587 F.3d 1063, 1067 n.7 (10th Cir. 2009).

## IV.    <u>ANALYSIS</u>

A.    **I recommend granting summary judgment on Boulden's First Amendment claim (Count V) because the undisputed material facts establish that the temporary policy was reasonable under the *Turner* factors.**

      1.    <u>The *Turner* factors.</u>

I recommend the Court find that the policy temporarily suspending certain correspondence

courses did not violate Boulden's First Amendment right. The Tenth Circuit has explained the

interaction between an inmate's rights and the prison's authority:

> Resolution of the inmates' claims requires balancing between the constitutional rights retained by inmates and those who send them publications against the deference owed to prison authorities when it comes to prison administration. *Turner v. Safley,* 482 U.S. 78, 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Inmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison. *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Clement v. Cal. Dep't of Corrs.,* 364 F.3d 1148, 1151 (9th Cir.2004). In weighing the First Amendment interests against the deference afforded corrections officials, the reasonableness of the regulations and policies matters. *Thornburgh v. Abbott,* 490 U.S. 401, 414, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

*Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004) (finding error in the district court's

*Turner* analysis because the court only discussed the first factor and no others). An inmate's

challenge to a restriction must "include sufficient facts to indicate the plausibility that the actions

of which he complains were *not* reasonably related to legitimate penological interests." *Gee v.

Pacheco*, 627 F.3d 1178, 1187–88 (10th Cir. 2010).

With that background in mind, the Court previously found that Boulden stated a First Amendment claim based on Defendants allegedly prohibiting his access to educational material. [Doc. 135, p. 9]. It noted that in the specific context of "a prison regulation imping[ing] on inmates' constitutional right to receive information, the regulation is valid if it is *reasonably related* to legitimate penological interests." *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)). The Court thus directed Defendants to analyze the policy at issue under the four *Turner* factors governing this inquiry:

> (1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest; (2) whether alternative means of exercising the constitutional right remain available to inmates; (3) any effect accommodating the right would have on guards, inmates, and allocation of prison resources; and (4) the absence of ready alternatives.

[Doc. 149]; [Doc. 135, p. 10] (internal citation omitted).

2.    The policy was reasonable and related to legitimate prison interests under the *Turner* factors.

I analyzed the temporary suspension policy under the *Turner* factors in my previous PF&RD for the GEO Defendants' Motion for Summary Judgment. [Doc. 188, at 8-11]. The Court adopted my recommendation to find that the policy was related to the legitimate penological interest and did not violate Boulden's First Amendment rights. *See* [Doc. 191]. The same analysis applies to the instant *Turner* factor inquiry because only the defendants have changed; the underlying factual basis has not. Further, the State Defendants present similar arguments in support of the policy's reasonableness. Thus, I propose the same finding: the policy's temporary suspension of certain courses lawfully addressed the legitimate interest of prison safety and fairness while maintaining other ways to exercise inmates' First Amendment right. I analyze the individual factors below.

i.    Turner *Factor #1*.

The policy satisfies the first *Turner* factor because NMCD has the legitimate, neutral objective of ensuring that inmates lawfully complete their sentences. I agree with the State Defendants that neutrality has been shown because the "temporary suspension pending review and revision to the policy affected all independent correspondence courses." [Doc. 164, at 25]. This even-handed application was employed despite the main problem being LSA abuse affecting "an inmate's ability to participate in independent correspondence courses . . . that were religious in nature." *Id*. Boulden was not participating in the religious classes which the policy affected. However, the policy applied to all independent study correspondence courses. Therefore, I agree with the State Defendants that the policy is neutral on its face.

I also agree that the policy had a legitimate objective. "Legitimate policy interest" is a fairly easy standard for prison officials to meet due to their substantial discretion over prison security, resources, and rehabilitation goals. *See* 1 Rights of Prisoners § 2:5 (5th ed.) (collecting cases). NMCD temporarily instituted the policy so that inmates could not reduce their sentences by accruing good time through courses from unaccredited institutions unapproved by NMCD. Prison officials were responding to an ongoing, specific problem with a temporary stop-gap solution. This solution, the temporary suspension, furthered the legitimate goal of maintaining fairness and order by ensuring all inmates served their lawfully imposed incarceration terms.

Arbitrary or unequal good time reductions of inmate sentences arising from unapproved classes undermined valid penological interests. The policy rationally aimed to return to and maintain fairness and order in postsecondary education and good time policies in prison.

14

Moreover, Boulden effectively concedes the first *Turner* factor in substance; his protest that the policy's duration rendered it illegitimate is conclusory and unfounded in the record.

    ii.  Turner *Factor #2.*

   The policy also satisfies the second *Turner* factor because inmates had alternative means of exercising their First Amendment rights. Prisoners have a constitutional right to correspond with persons outside the prison subject to the legitimate objectives and concerns of the prison. *Turner*, 482 U.S. at 84; *Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir. 1990). As I discussed in my prior *Turner* analysis [Doc. 188, at 10], Boulden views the First Amendment as constitutionally ensuring his right to the particular type of class he wants—independent study correspondence courses—which he alleges the policy unlawfully curtailed. This framing still slices the right too fine insofar as Boulden would effectively have it enshrine his right to legal studies in prison from educational institutes outside of prison. The State Defendants clarify the proper parameters of Boulden's First Amendment right:

> As stated in *Thornburg,* the "'right' in question must be viewed sensibly and expansively" and "it is sufficient if other means of expression…remained available." *Thornburg*, at 490 U.S. 417-18, 109 S.Ct. 1884 (internal citation omitted). Plaintiff has the burden of identifying a recognized constitutional right. Even if Plaintiff has a right to access education as an inmate, pursuant to *Thornburg* he does not necessarily have a right to continual access to independent study correspondence courses particularly, where there is a legitimate penological justification for temporarily suspending access to such courses.

[Doc. 164, at 26].

   Boulden responds: "[t]here was <u>absolutely no alternative means</u> of exercising my right to legal published studies." [Doc. 173, at 28]. He argues that the prison's internal curriculum does not include legal classes, nor is the "unilaterally chosen Mesalands Community College (MCC)" sufficient because one legal course offered counted towards the business degree rather than a law-

related degree. *Id.* at 28. Boulden thus insists there was no other way he could pursue the type of law degree he wanted.

However, as the State Defendants note, Boulden cites no law supporting his claimed right to "legal published studies." [Doc. 180, at 9]. Nor did the policy prevent him from taking the whole catalogue of correspondence classes; only new correspondence courses "requiring independent study." *Id.* Boulden's claim of no alternative way to secure educational materials is therefore unsupported. By his own admission he continued taking courses through Mesalands Community College "provided from GEO's Education Department," though "none were courses toward becoming a qualified paralegal." [Doc. 173, at 29]. Boulden fatally misconstrues his right to access educational opportunities generally with an unfounded right to pursue his personal educational goals and career study. Thus, there is no constitutional obstacle under the second *Turner* factor.

     *iii.*     Turner *Factor #3.*

The policy satisfies the third *Turner* factor because the impact of accommodating Boulden's preferred educational course would undermine prison operations and burden employees and resources. This factor is similar to the first factor considering the regulation's reasonableness; however, the third factor "considers a more hypothetical state of affairs in which the court considers the reasonableness of the prohibition in light of alternative ways of operating the prison proposed by the plaintiff." 1 Rights of Prisoners § 2:7 (5th ed.) (collecting cases).

I propose finding that the State Defendants' argument prevails. They urge that Boulden's request to effectively exempt him from the temporary policy poses more problems to program management and prison administration than constitutional benefit to Boulden. [Doc. 164, at 27]. Of particular salience, the State Defendants note the "differential treatment"—caused by

Boulden's request for staff to individually review the accreditation status of his chosen educational institutions—unduly risks causing "discontent, grievances, and lawsuits" among other inmates. *Id.* Boulden protests that "the only impact . . . is a positive one" because he believes his proposed policy produces "a more mature and peaceful inmate," in turn decreasing security concerns and increasing young inmate mentorship. [Doc. 173, at 30].

Boulden errs by "misunderstand[ing] this factor as it focuses on the impact the regulation has on staff and inmates" and "not the impact on [Boulden] himself." [Doc. 180, at 10]. Indeed, such a self-referential perspective fails to contravene the facts showing "the burden [of] researching accreditation on NMCD staff." *Id.* I therefore reiterate my prior finding and urge the same as to the State Defendants:

> Practical problems arise from singling out one inmate to provide a type of study materials unavailable to the general inmate population. Prison employees would need to direct additional personalized attention to managing Boulden's independent correspondence coursework instead of other important tasks. It could also create a negative "ripple effect" because "changes to one area of prison administration can often cause problems in other areas." *Id.* It is reasonable for officials to anticipate that other inmates would view the accommodation as unfairly allowing Boulden to benefit from good time credits they are denied. *Id.* Because inmates (including Boulden) may still take advantage of other educational opportunities, the impact of accommodating Boulden specifically outweighs the policy's inconvenience to him.

[Doc. 188, at 11]. In sum, this factor strengthens the policy's reasonable relation to legitimate prison interests.

> iv.    Turner *Factor #4.*

The policy satisfies the fourth *Turner* factor because there is no apparent, workable alternative to accommodate Boulden with a *de minimus* effect on valid penological interests. This factor examines whether the policy is "an exaggerated response to a prison's administration." 1 Rights of Prisoners § 2:8 (5th ed.) (collecting cases). The State Defendants offer that they "relied on their professional judgments to determine the best course of action" after considering competing

interests and formulated the temporary policy in response. [Doc. 164, at 18]. Boulden maintains the policy was "grossly exaggerated" in proportion to the LSA misuse issue "at one prison" because it "fr[oze] all independent study 'until further notice and upon policy revision' *at all eleven prisons!*" [sic]. *Id.* at 30.

Boulden's response recycles his prior unpersuasive arguments. It is Boulden's burden to show obvious, easy alternatives to the regulation, but his proffered alternative to apply the policy only to the problematic religious correspondence courses invites discriminatory effect and comprises neutrality. I thus propose finding that the fourth factor favors the policy's constitutional legitimacy.

Overall, the *Turner* factors confirm that the temporary policy suspending independent study correspondence courses was a reasonably tailored way to ensure inmates did not abuse good time credits to circumvent their sentences. Boulden has not sufficiently controverted any undisputed material facts supporting the validity of the policy under *Turner*. I therefore propose finding that the policy did not violate Boulden's First Amendment rights.

**B.      I Recommend Granting Summary Judgment on Boulden's Fourteenth Amendment Claim (Count X) Because Boulden Fails to Meet Its Elements.**

1.      <u>The Fourteenth Amendment.</u>

I propose finding that summary judgment is proper on Boulden's Fourteenth Amendment claim because he cannot establish the essential elements of his Fourteenth Amendment claim. "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221, (2005). To succeed on a deprivation of educational correspondence claim, a plaintiff must prove that his educational materials were not

delivered, that defendant was responsible for the non-delivery, and that defendant acted intentionally or was deliberately indifferent. *Id.*

To succeed on a procedural due process claim, a plaintiff must show (1) he possessed a protected interest invoking due process protections, and (2) he was not afforded an appropriate level of process. *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994). Absent a protected interest under the first element, no constitutional process is required. *Templeman v. Gunter*, 16 F.3d 367, 371 (10th Cir. 1994). In the prison context, a due process-protected liberty interest only arises where a prison action creates an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" considering its effect on conditions of confinement. *Sandin v. Connor*, 515 U.S. 472, 484 (1995).

The Court previously found that Boulden plausibly alleged "the complete bar from receiving educational material violated his liberty interest under the Fourteenth Amendment." [Doc. 135, p. 11]. It explained "a prisoner has a liberty interest under the Fourteenth Amendment in correspondence and publications in the mail." *Id.* at 12. (citing *Treff v. Galetka*, 74, F.3d 191, 194-95 (10th Cir. 1996)) (stating that inmate correspondence outside the prison implicates the First Amendment "and a qualified liberty interest under the Fourteenth Amendment")*.*

    2.    <u>The policy did not violate the Fourteenth Amendment because no there was no protected interest at stake nor any actionable deprivation of coursework.</u>

Boulden alleges in Claim X that the State Defendants "have egregiously violated Plaintiff's Constitutional rights by their direct and deliberate acts" under the Fourteenth Amendment [Doc. 40, p. 11]. The State Defendants contest this because "neither the language of a statute nor a policy alone is sufficient to create a liberty interest." [Doc. 164, p. 29]. They emphasize that prison vocational training is a "privilege," not a constitutional right. *Id.* (citing *Burch v. Jordan*, No. 07-

cv-03236, 2010 WL 5391569, at *22 (D. Kan. Dec. 22, 2010) and *Robinson v. Smith*, 982 F.2d 529
(10th Cir. 1992)).

In *Robinson*, the Tenth Circuit clarified it "has never determined that prisoners enjoy an
entitlement to educational or rehabilitation services," and therefore, a limitation on education
inside the prison does not transgress a constitutional right. *See Robinson*, 982 F.2d at 429 (internal
citation omitted). Thus, to the extent Boulden asserts the State Defendants violated his procedural
due process liberty interest through temporarily halting some classes, no such protected interest
exists and so no due process violation occurred. Boulden provides no authority to the contrary.

However, even assuming a protected interest existed his Fourteenth Amendment claim
would still fail on the merits. It remains undisputed that prison officials gave Boulden "all the
process he would have been due" through the internal grievance system and consequently allowed
him to enroll in the desired class. [Doc. 164, p. 30] (citing UMF 30). Moreover, I agree that
Boulden's continuing paralegal and accounting education negate any alleged "atypical and
significant hardship" in his ordinary prison life. *Id.* at 30–31 (explaining the relevant timeline of
the October 2018 grievance, January 2019 paralegal course completion, February 2019 accounting
enrollment, and March 2019 advanced paralegal enrollment). Not being able to continue his
professional certification on the continuous, uninterrupted timeline he wanted is not unlawful, but
a natural collateral consequence of incarceration.

In sum, I propose finding that Boulden cannot establish the essential elements necessary to
sustain a Fourteenth Amendment violation nor demonstrate a genuine issue of material fact
necessary for the claim to survive summary judgment.

**C.    I Recommend Granting Summary Judgment for Roark Because Qualified Immunity Shields Him from Liability on the Personal Capacity Claims.**

I also propose finding that Roark is entitled to qualified immunity on the personal capacity claims. The undisputed facts establish that Roark left the position of Deputy Secretary of the New Mexico Corrections Department in October 2018. [Doc. 164, p. 4] (citing Exhibit MM). Thus, Roark was not employed at the prison when the main alleged educational deprivations occurred in late 2018 and early 2019.

1.    Qualified Immunity

The defense of qualified immunity shields a government actor from liability and the burdens of litigation unless the plaintiff can show the government official (1) violated a federal right, and (2) the right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A right is clearly established when it is "so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned,'" typically because of on-point Supreme Court or Tenth Circuit precedent. *Glover v. Gartman*, 899 F. Supp. 2d 1115, 1139 (D.N.M. 2012) (omitting internal citation). The defense of qualified immunity only applies to actions against government officials sued in their personal capacities. *Cox v. Glanz*, 800 F.3d 1231, 1240 (10th Cir. 2015).

This Court has previously explained the principles of and differences between personal liability and supervisory liability in the prisoner civil rights context:

> In alleging a § 1983 action against a government agent in their individual capacity, "a plaintiff must plead that each Government-official defendant, *through the official's own individual actions, has violated the Constitution*." *Ashcroft*, 556 at 676 (emphasis added). In other words, personal liability under § 1983 "must be based on [a defendant's] *personal involvement*" in a constitutional violation, "and supervisory liability must be based on [a defendant's] Policy." *Brown*, 662 F.3d at 1164–65 (emphasis added).

21

*Kincaid v. GEO Grp., Inc.*, No. 23-cv-00644, 2024 WL 4241549, at *6 (D.N.M. Sept. 19, 2024).

Applying these principles, the Court stated:

> Plaintiff must show an "affirmative link" between [the defendant] and the supposed constitutional violations through the following elements: (1) personal involvement; (2) causation, and (3) state of mind. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013); *Keith v. Koerner*, 843 F.3d 833, 837 (10th Cir. 2016). Mere knowledge of a subordinate's allegedly unconstitutional conduct is insufficient to hold the supervisor liable. *Schneider*, 717 F.3d at 767.

*Id.*

### 2. Boulden cannot overcome qualified immunity.

The State Defendants urge, and I agree, that Boulden has failed to advance any clearly established right violated by Roark. Boulden accuses Roark of letting the policy linger too long, rendering it unlawful, and then failing to rescind it or direct his successor to do so. However, Boulden's pleadings and responses are devoid of any on-point, controlling authority establishing a civil rights violation from these facts. To be sure, Boulden still took old and new courses during this temporary suspension period "with a delay of less than three months between when he finished the coursework for his paralegal studies and when he began taking advanced paralegal courses." [Doc. 164, p. 32]. To the extent Boulden attempts to assess personal or supervisory liability against Roark as well, this effort also fails absent an underlying constitutional violation. *See Kincaid*, 2024 WL 4241549, at *6.

I thus propose finding that the material facts supporting Roark's entitlement to qualified immunity remain undisputed. Boulden's unsupported assertions to the contrary do not overcome this barrier to liability.

**D.    I Recommend Declining to Exercise Supplemental Jurisdiction on the Remaining State Law Claims.**

1.    <u>The matter is ripe to rule on supplemental jurisdiction over the state law claims.</u>

The State Defendants request summary judgment be entered against Boulden on the state law claims "based upon no waiver of immunity and failure to state a claim for which relief can be granted." [Doc. 14, at 33] (incorporating arguments in [Doc. 66, at 8-14] Motion for Judgment on the Pleadings). Boulden's counterargument that the State Defendants violated state law analogues to his federal constitutional rights and NMSA 33-2-34(E) is conclusory and therefore inapposite. [Doc. 173, at 34].

At its present posture, all federal claims have been dismissed. The Court previously dismissed with prejudice all federal claims "related to the denial of two lump sum awards of good tune credits, pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994)." [Doc. 135, at 2]. In the same order, the Court declined to dismiss Count V and Count X under *Heck* because they instead related to alleged denial of access to educational material. *Id.* The Court further declined to dismiss the state law claims under *Heck. Id.* In summary, the Court dismissed Counts I, VI, VII, and VIII regarding good time credits under *Heck*, and Counts XI and XII; all federal constitutional claims against Defendants Tafoya Lucero and Jablonski "[t]o the extent *Heck* does not apply"; and reserved ruling on the state law claims. *Id.* at 18.

After the filing of *Martinez* reports and motions for summary judgment, the Court adopted in part my PF&RD [Doc. 188]. [Doc. 191]. The Court accordingly dismissed with prejudice Counts V and X (the remaining federal claims) against the GEO Defendants but reserved ruling on the state law clams "until the federal claims against the other defendants are addressed." *Id.* at 4. This PF&RD recommends dismissal the federal claims against those defendants.

23

2. <u>Precedent counsels against exercising supplemental jurisdiction,</u>

Considering the procedural history, I recommend the Court decline to exercise supplemental jurisdiction over the remaining state law claims. The supplemental jurisdiction statute permits a court to decline supplemental jurisdiction under several circumstances, including when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C.A. § 1367 (c)(3). Further, it is well-settled that "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir.1998); *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011).

As outlined above, I proposed finding that Boulden has failed to meet essential elements of his remaining First and Fourteenth Amendment claims against the State Defendants. I therefore recommend the Court enter summary judgment and dismiss those claims with prejudice, which would leave only the state claims pending. Should the Court agree, this recommendation would dispose of all federal claims against all defendants (GEO and State defendants). The sole remaining state law claims would thus become ripe for ruling. Because Boulden's federal constitutional claims (now dismissed) invoked the Court's original federal question jurisdiction, the remaining state law claims necessarily fall within the Court's discretionary supplemental jurisdiction. *See Kincaid*, 2024 WL 4241549, at *8. This posture fits the circumstance contemplated by § 1367 warranting dismissal of state law claims. *See* § 1367 (c)(3).

My previous PF&RD also recommended the Court decline exercising supplemental jurisdiction after analyzing the Tenth Circuit's *Foxfield* decision. [Doc. 188, at 17]; *see Foxfield Villa Assocs., LLC v. Robben*, 967 F.3d 1082, 1103 (10th Cir. 2020). *Foxfield* suggested a court

retain jurisdiction if the parties have substantially worked on the state law claims but assured a court may also decline jurisdiction without abusing discretion if "it gives good reasons for doing so." *Foxfield*, 967 F.3d at 1103. Without repeating the entire analysis, I renew my recommendations to decline keeping the state law claims in federal court for the reasons therein, such as "copious" state law questions and uncertainties. [Doc. 188, at 17-19].

For these reasons, I recommend the Court decline to extend its supplemental jurisdiction to decide Boulden's state law claims without any remaining federal law claims and dismiss or remand those claims as the Court sees fit.

## V.     CONCLUSION

I respectfully **RECOMMEND** that the Court **GRANT** the State Defendants' Motion for Summary Judgment [Doc. 164] on **Count V** alleging First Amendment violations and **Count X** alleging Fourteenth Amendment liberty interest violations and **DISMISS** those claims.

I further **RECOMMEND,** should the Court adopt the recommendation to dismiss the federal claims (Counts V and X), that the Court decline to exercise supplemental jurisdiction over state law claims and so **DISMISS OR REMAND** them to state court for resolution.

I further **RECOMMEND**, should the Court adopt the above recommendations to dismiss the remaining federal constitutional claims and state claims, and there being no unresolved claims against any proper defendant to this action, that the Court **DISMISS THIS MATTER WITH PREJUDICE AND ENTER FINAL JUDGMENT** on Boulden's claims.

**JERRY H. RITTER**
**UNITED STATES MAGISTRATE JUDGE**

25

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**